UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

|  |  |  |
|---|---|---|
| In re: | ) | Lead Case No. 1:02-cv-386 |
|  | ) |  |
|  | ) |  |
| UNUMPROVIDENT CORP. | ) |  |
| DERIVATIVE LITIGATION | ) | MDL Case No. 1:03-md-1552 |
|  | ) | Chief Judge Curtis L. Collier |

## MEMORANDUM

At the fairness hearing in this shareholder derivative case, the Court approved the parties' proposed settlement, *see* Fed. R. Civ. P. 23.1(c), but took under advisement the issue of attorney's fees and costs to which Plaintiffs would be entitled, as well as the possibility of an incentive award for the named Plaintiffs. Prior to the hearing, Plaintiffs filed their motion seeking attorney's fees (Court File No. 66) and supporting memorandum (Court File No. 68). The Court granted nominal defendant Unum additional time to respond to Plaintiffs' motion, and it filed a response (Court File No. 86). Plaintiffs filed a reply (Court File No. 93). The parties also submitted supplemental material and evidence. For the following reasons, the Court will **GRANT IN PART** Plaintiffs' motion for attorney's fees and award $3.3 million, and the Court will **DENY** the motion for an incentive award for the named Plaintiffs.

## I. FACTS AND PROCEDURAL HISTORY

This consolidated action involves multiple shareholder derivative suits filed on behalf of UnumProvident Corporation ("Unum") against current and former directors and officers of the company.

The Verified Consolidated Derivative Complaint (Court File No. 28) filed in April 2004 and Intervenor Complaint (Court File No. 57) filed in October 2007 allege Unum's predecessor company was facing large liability in the 1990s. To remedy this "crisis," a new senior management team at the insurance company revised the claims process to facilitate and institutionalize the denial of claims. This continued as the company merged with other companies to form Unum Corporation, now known as Unum. The directors allegedly knew about the improper and illegal nature of the claims processes at their company or acted in reckless or conscious disregard of the improper/illegal processes. The red flags that were known to the directors included reports and investigations by state insurance regulators, multiple lawsuits, and media reports. But the directors failed to ensure the claims review process adhered to the law. This violated the directors' fiduciary obligations of good faith, loyalty, and candor. The misconduct caused significant costs to carry out investigations and defend lawsuits, and harmed Unum's image and stock price.

In their answers, the directors denied liability and raised various affirmative defenses. Plaintiffs engaged in extensive discovery. They also pursued settlement. Although the directors deny any wrongdoing or harm to Unum, they reached a settlement agreement, to which the Court gave preliminary and then final approval.

The settlement provides for both monetary damages ($30 million) to Unum from the directors' insurance carriers and for changes to corporate governance and compliance. The changes are detailed in the settlement. They include adopting and maintaining an enterprise risk management program to identify, monitor, and mitigate legal and operational risks, and which will be overseen by a chief risk officer; creating an internal audit group; maintaining a chief ethics officer; and annually electing an independent director to preside over executive sessions of Unum's independent

2

directors. Those changes will be in place for at least three years from the settlement's effective date, and Unum will be obligated to fully fund those provisions for that time period.

Plaintiffs argued a settlement was the best course of action to avoid the expense, time, uncertainty, and risk of litigating their claims. The parties conducted extensive arm's length negotiations. Plaintiffs' counsel believes the stipulation confers substantial benefits to and is in the best interests of Unum and its shareholders.

The settlement also provided for Plaintiffs to apply to the Court for an award of attorney's fees and expenses of up to $4.5 million. The Court received no objections to the settlement, but Unum and one shareholder object to the application for attorney's fees.

## II.     DISCUSSION

Plaintiffs requests an aggregate award of $4.5 million for attorney's fees and expenses, equal to 15% of the monetary benefit to Unum. Plaintiffs contend this amount is reasonable given the results achieved, consistent with awards in similar complex litigation matters, and fully consistent with multipliers based on a lodestar analysis. Unum disagrees. It contends the award should be calculated based on the number of hours reasonably expended by Plaintiffs' counsel, for which Unum contends the documentation is inadequate, and in any event the $4.5 million sought significantly exceeds any reasonable award.

Under the so-called American rule, each party normally bears its own costs. However two significant exceptions exist, "statutory fee-shifting provisions and the equitable common fund doctrine." *Newberg on Class Actions* ¶ 14:1. No statutory fee-shifting provision is applicable in this case. Instead, Plaintiffs are entitled to attorney's fees because they conferred a benefit to Unum

3

on behalf of Unum and its shareholders. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970).

Although the shareholders in this case are not part of a class action, they are an ascertainable class,

and the costs of a benefit to them should be spread proportionately among them. *See id.* at 394.

Thus, the Supreme Court in 1970 noted approvingly that "courts increasingly have recognized that

the expenses incurred by one shareholder in the vindication of a corporate right of action can be

spread among all shareholders through an award against the corporation, regardless of whether an

actual money recovery has been obtained in the corporation's favor." *Id.* The Supreme Court

stated:

> Where an action by a stockholder results in a substantial benefit to a corporation he
> should recover his costs and expenses. . . . [A] substantial benefit must be something
> more than technical in its consequence and be one that accomplishes a result which
> corrects or prevents an abuse which would be prejudicial to the rights and interests
> of the corporation or affect the enjoyment or protection of an essential right to the
> stockholder's interest.

*Id.* (quoting *Bosch v. Meeker Cooperative Light & Power Assn.*, 101 N. W. 2d 423, 426-27 (Minn.

1960)).

The fees awarded must be reasonable. *See Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d

1188, 1196 (6th Cir. 1974). The Sixth Circuit set out six considerations for determining reasonable

fees in a shareholder derivative case: "1) the value of the benefit rendered to the corporation or its

stockholders, 2) society's stake in rewarding attorneys who produce such benefits in order to

maintain an incentive to others, 3) whether the services were undertaken on a contingent fee basis,

4) the value of the services on an hourly basis, 5) the complexity of the litigation, and 6) the

professional skill and standing of counsel involved on both sides." *Id.*

### A.     Role of the Settlement

After the Court approved the settlement of this case, Unum has attempted to undercut some

stipulations regarding the benefits from this settlement. In the settlement, Unum agreed that the "pendency and prosecution of the Derivative Claims and derivative plaintiffs' participation in the settlement negotiation process were substantial factors in the Company's ability to obtain $30 million in insurance proceeds from the Company's Directors' and Officers' Insurance Carriers." (Court File No. 62, ex. 1 at 11). Unum also "agree[d] to have implemented and to maintain in effect" certain corporate governance and compliance provisions (*id.* at 12).

In its brief, Unum acknowledges the "substantial factor" language, but then attempts to explain why, in fact, this stipulation is false. "The insurance monies were not paid in settlement of this case, or in consideration of any of the releases set forth in the Stipulation," Unum contends (Court File No. 86 at 21). Unum explained the $30 million was actually in exchange for policy releases from its insurance carriers, who had denied coverage to Unum with regard to various MDL actions. Unum concludes "the pendency of this case was one factor among many others — including a host of other pending litigations and the fact that Unum relinquished nearly $200 million in insurance coverage — that enabled Unum to settle its insurance claim for some $30 million total." (*Id.* at 22). Unum makes similar claims regarding the corporate governance procedures, emphasizing the settlement was "'*a* substantial factor,' among many others" in their adoption and maintenance (*id.* at 19). Unum also contends most of these procedures were already adopted, and it attributes certain changes in its procedures to the settlement of another lawsuit and a regulatory settlement. To these contentions, Plaintiffs respond that they presented governance and compliance proposal to Unum as early as February 2005. And the stipulations reached by the parties in the settlement expressly attribute the adoption of various proposals to Plaintiffs.

The Court cannot and need not determine the exact portion of the monetary contributions and

governance changes attributable to the this case. The settlement terms provide enough of an idea, which is that the pendency and prosecution of this case "were substantial factors in" obtaining the $30 million, and the prosecution of this case and Plaintiffs' proposals "were a substantial factor" in adopting and/or maintaining the governance changes. "Substantial" is defined by Webster's Third New International Dictionary, in relevant part, as "being that specified to a large degree or in the main." Although other factors certainly played a role in the receipt of the $30 million, this case played a substantial role.

### B. Benefits From the Settlement

Having determined that the $30 million in insurance payments and corporate governance changes were caused in substantial part by this case, the Court must determine what attorney's fees and expenses should be awarded. As noted earlier, providing attorney's fees makes the corporation, and all of its shareholders, pay for the benefit it received, rather than saddling individual shareholders with the cost of the prosecution. *See Mills*, 396 U.S. at 392. Plaintiffs seek an award of 15% of the monetary benefit, whereas Unum contends the award should be based on the documented reasonable hours and hourly rate of Plaintiffs' counsel.

Plaintiffs contend precedent concerning common funds supports awarding them a percentage of the monetary recovery. Unum argues there is no common fund in this case. It is true this is not a classic common fund case, in the sense that there is no fund from which class members are receiving money. But there is a fund here in the general sense: Unum received $30 million in substantial part due to prosecution and pendency of this case. The Supreme Court's discussion in *Mills* supports the proposition that a shareholder derivative action mirrors a class action in that the benefit is spread among a group: Courts have "permit[ed] reimbursement in cases where the

6

litigation has conferred a substantial benefit on the members of an ascertainable class, and where

the court's jurisdiction over the subject matter of the suit makes possible an award that will operate

to spread the costs proportionately among them. This development has been most pronounced in

shareholders' derivative actions . . . ." *Mills*, 396 U.S. at 393-94. The Supreme Court went on to

describe cases in which "there was a 'common fund' only in the sense that the court's jurisdiction

over the corporation as nominal defendant made it possible to assess fees against all of the

shareholders through an award against the corporation." *Id.* at 394-95.

Adopting Unum's narrow view of the common fund doctrine would put form over substance.

*Cf. Reiser v. Del Monte Properties Co.*, 605 F.2d 1135, 1140 (9th Cir. 1979) ("The form of suit is

not a deciding factor; rather, the question to be determined is whether a plaintiff, in bringing a suit

either individually or representatively, has conferred a benefit on others. To suggest that an

individual suit which corrects a violation of the proxy statutes is less beneficial than a class action

accomplishing the same result would be to disregard the effect of the suit."). Had the shareholders

of Unum brought a class action in which they recovered $30 million to be distributed amongst the

shareholders, that would be a classic common fund. The inconsequential difference in this case is

that shareholders filed a derivative action on behalf of Unum, and it is Unum that recovered the $30

million, which thus benefits the shareholders. *Mills* makes clear that the cost of attaining this benefit

for shareholders should be shared proportionately among the shareholders through an award against

Unum.

That this award may be based on a percentage of the recovery is apparent from the Sixth

Circuit's list of factors in *Ramey*, a shareholder derivative case like the instant case. If the lodestar

is, as Unum contends, the only appropriate method of calculating attorney's fees in a shareholder

7

derivative case, then it would not be the fourth of six enumerated considerations. *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974). The first enumerated consideration listed by the Sixth Circuit is "the value of the benefit rendered to the corporation or its stockholders." *Id.*; *see also Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983) (noting district court may adjust award from lodestar to reflect "economic benefit conferred upon the corporation"). Thus, it is clear that the benefit to the corporation from the attorney's work is a relevant consideration, just like the loadstar is a relevant consideration. *Cf. Rawlings v. Prudential-Bache Properties*, 9 F.3d 513, 516 (6th Cir. 1993) ("When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done *as well as for the results achieved*.") (emphasis added). To put it simply, whether the $30 million is called a common fund or the value of the benefit rendered, the fact is $30 million was recovered in substantial part due to this case and that is a consideration in determining attorney's fees. *See also Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 770 (9th Cir. 1977); *Sugarland Indus. v. Thomas*, 420 A.2d 142, 150 (Del. 1980).

Unum contends no common fund was created because this case "did not result in the creation of a fund to be divvied up among the plaintiffs, as is the case in common fund cases." (Court File No. 86 (quoting *Geier v. Sundquist*, 372 F.3d 784, 790 (6th Cir. 2004)). While *Geier*'s description of a common fund case is typical, its description of a fund being "divvied up among the plaintiffs" cannot be applied literally to a shareholder case; although the fund is not divvied up, there is benefit to the corporation which is inherently split among the shareholders. *See Ramey*, 508 F.2d at 1196; *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164-65 (Del. 1989) ("Typically, successful derivative or class action suits which result in the recovery of money or property wrongfully

8

diverted from the corporation, or which result in the imposition of changes in internal operating procedures that are designed to produce such monetary savings in the future, are viewed as fund creating actions."). *Geier*, which led to the desegregation of Tennessee's higher education system, held the common fund method was inapplicable for the vindication of a social grievance. 372 F.3d at 790. Such a benefit "is not pecuniary in any conventional way," *id.*, but a $30 million award is pecuniary. It is a quantifiable benefit created by the settlement of this case, and therefore consideration of a percentage award is appropriate. *Cooperstock v. Pennwalt Corp.*, 820 F. Supp. 921, 926 (E.D. Pa. 1993).

Unum also objects that the award of attorney's fees from a fund must come from a fund itself—but it states it has already paid out the money. Thus, any recovery would be from Unum's assets rather than from the assets of the losing party, as is proper in common fund cases, Unum argues. The Court finds this argument baffling. Fees in common fund cases are extracted from the predetermined damage recovery rather than obtained from the losing party. *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988). Unum recovered $30 million from its directors' and officers' insurance carriers. Rather than being a losing party, is was victorious in a derivative suit brought by shareholders on its behalf. Unum was a nominal defendant, not a losing defendant. Unlike statutory fees, which result in a shifting of the fee burden to the losing party, common fund cases result in a sharing of the fees among those benefitted by the litigation. *Id.* Unum benefitted from this litigation and must therefore share the benefit. Whether the Court uses a percentage approach or a loadstar approach, Unum will owe attorney's fees, so it of no use to claim the money is gone.

B.    **Lodestar**

9

In rejecting Unum's contention that the benefit to it cannot be considered, the Court does not reject the use of other considerations, as required in *Ramey*. As noted, one of those considerations is the lodestar, and the Court shares some, but not all, of the concerns raised by Unum. Unum argues this was a relatively simple case, at least as far as complex derivative actions go, and that records of what timekeepers did are insufficient and the hours recorded exceed any measure of reasonableness. Unum also argues there were no substantive or contested motions (aside from the instant one), counsel's work was based in part on already existing cases, there was no plaintiff with standing for a period of time, and contract attorneys should be expenses rather than a part of the attorney's fee.

The lodestar can be used to cross-check the percentage award. *See Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996) (approving of district court's use of lodestar to cross-check a common fund award); *Smillie*, 710 F.2d at 275 (6th Cir. 1983). The lodestar is calculated by multiplying the number of hours reasonably expended on the case times the reasonable hourly rate. *See Barnes v. City of Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005). Current rates can be used to compensate for the delay in payment during the pendency of the litigation. *See id.*

Plaintiffs contend the lodestar in this case is about $3.0 million, which results in an enhancement multiplier of 1.43 to reach the $4.5 million minus expenses Plaintiffs seek. Plaintiffs contend this multiplier is reasonable. Unum challenges the reasonableness of the number of hours expended on the case, reasonable hourly rates for Plaintiffs' attorneys, and the multiplier.

Unum argues there is an insufficient basis to evaluate the reasonableness of the fee because of the lack of detailed documentation. Without detailed time records, Unum contends the Court cannot determine what hours the lawyers really worked and whether the work is compensable.

10

Plaintiffs contend they have submitted sufficient time records and other material describing their work. The time records they have submitted split their work into five categories and specify how many hours each attorney worked in each category during each month. There is no specific contemporaneously-recorded description of the work, but none was required. At the fairness hearing, the Court stated, "I don't think that [Plaintiffs] should be called upon to produce actual billing records. I think summaries or assertions by the attorneys ought to suffice." (Transcript (Court File No. 78) at 26). So the Court considers the information supplied by Plaintiffs to be sufficient. Unum contends the hourly rates assessed are too high.

Unum argues there is no evidence supporting the reasonableness of the claimed rates in this district, the rates are beyond any rates approved in federal courts in Tennessee, there is no indication clients have ever paid the claimed rates, and too many tasks were performed by partners. Plaintiffs contend the rates are reasonable given the skill, experience, and reputation of their out-of-town counsel. Although local rates normally prevails, an out-of-town specialist may be compensated at non-local rates if hiring the out-of-town specialist was reasonable and if "the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation." *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995). Plaintiffs contend hiring Delaware counsel was reasonable because Unum is a Delaware corporation subject to Delaware law in matters of corporate governance and derivative litigation. Given the difficulty of litigation involving director liability for failure of corporate oversight, *McCall v. Scott*, 250 F.3d 997, 999 (6th Cir. 2001) (citing *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del Ch. 1996)) (describing such litigation as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment"), it was reasonable to retain counsel with experience and

11

skill in prosecuting such a case. That the defendants were represented by skilled attorneys at large

New York firms also supports Plaintiffs' judgment in selecting highly-qualified attorneys from

outside this district. *See Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982).

Furthermore, Plaintiffs explain that senior attorneys were appropriate to handle complex pleadings,

legal analysis, settlement negotiations, and the design of corporate governance that constituted the

bulk of work in this case.

Unum also contends the number of hours expended was too high. Plaintiffs justify their

hours spent. The large number of hours expended is not clearly excessive.

### C.      Award of Attorney's Fees

Plaintiffs submitted two declarations from other attorneys with experience in complex

litigation in federal court in Tennessee opining the desired award of $4.5 million is reasonable given

the circumstances, including the contingent and complex nature of the case, the amount work

involved, the experience and reputations of the lawyers.

The Court finds the desired 15% recovery or 1.5 factor loadstar enhancement, is too high.

In addition to considering the value of the recovery and the lodestar, the Court has considered the

value to society of protecting shareholders from wrongdoing, the contingent nature of this case, and

the professionalism and experience of the counsel. Having considered these and other factors, and

reviewed the entire record, the Court concludes an award of $3.3, inclusive of expenses, is a

reasonable fee award. This award is 11% of the recovery, which takes into account the fact the

recovery is not due entirely to the work of Plaintiffs' counsel and the lack of any contested motions

regarding the merits of the case. This award is also based on the lodestar as reflected in the record

submitted by Plaintiffs' counsel, and includes a 10% enhancement which accounts for their

12

professionalism and the contingent nature of this case.

### III. Incentive Awards

Plaintiffs request a $5,000 incentive payment to each of the two named plaintiffs in this case. This money would be paid out of the attorney's fees and expenses awarded to Plaintiffs' counsel. The settlement agreement provided for Plaintiffs to make this request to the Court, and this information was communicated to shareholders in the notice. Other than allowing for Plaintiffs to make the request, Defendants have not expressed their view on the incentive award. Nor are there any objections related to this issue. The lack of objection, from either the defense or other shareholders, is probably because the incentive award will come out of the fees paid to counsel. Thus, Plaintiffs' counsel and the named plaintiffs are the only entities with an interest in this matter, other than the Court, which has a duty to apply the law.

There is no clear law on incentive awards in the Sixth Circuit. *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003) ("This court has never explicitly passed judgment on the appropriateness of incentive awards."); *Morris v. Tate*, 24 F. App'x 520, 526 (6th Cir. 2001) ("This court has not previously been called upon to approve a grant of incentive awards, and we intimate no view as to the propriety of such awards in general."). *Hadix* noted "there may be circumstances where incentive awards are appropriate," and noted courts within the circuit have given incentive awards. 322 F.3d at 898.

*Hadix* and *Morris* concern situations in which incentive awards were not proper. In *Hadix*, the named plaintiff wanted the defendants to pay an incentive award above their settlement agreement. Forcing the defendants to pay an incentive award not agreed to in their settlement would

13

be "plainly inappropriate." *Id.* at 898-99. Likewise, in *Morris*, the settlement agreement called for attorney's fees to be paid to counsel, but there was no provision for paying class representatives. 24 F. App'x at 526. Because incentive awards were not authorized by the settlement, the Sixth Circuit reversed the decision to give incentive awards. *Id.* at 529. Neither situation is applicable here. Although the settlement agreement itself does not mention incentive awards, the notice mailed to shareholders—which was approved by both sides—contemplates incentive awards. The notice states, "Plaintiffs' Counsel will make an application to the Court for award of an incentive fee for each named plaintiff in the amount of $5,000, to be paid from any fees awarded to Plaintiffs' Counsel." Thus, the awards come from Plaintiffs' counsel and are contemplated by both parties.

This case is unusual because the incentive award does not come from a common fund but from attorney's fees. *See Hadix*, 322 F.3d at 898 ("Without a common fund, however, there is no place from which to draw an incentive award. Unsurprisingly, we are unable to find any case where a claim for an incentive award that is not authorized in a settlement agreement has been granted in the absence of a common fund.").

In fact, there appear to be two cases in which incentive awards came from attorney's fees rather than a common fund. *In re Cendant Corp.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002); *In re Presidential Life Sec. Litig.*, 857 F. Supp. 331, 337 (S.D.N.Y. 1994). In both cases, the courts approved the incentive awards, finding they posed little reason for concern. "An incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected." *In re Cendant Corp.*, 232 F. Supp. 2d at 344 (approving incentive award from counsel to plaintiff because plaintiff performed a public service by stepping forward to represent corporation and its

14

shareholders) (citing *In re Presidential Life Sec. Litig.*, 857 F. Supp. at 337). The court in *In re Presidential Life Sec. Litig* considered the possible negative effects of such incentive awards paid from counsel fees but concluded a small award was not problematic:

> Whatever the potential risk or expense of litigation which may be incurred by named plaintiffs in class actions, excessive payments of incentives in class suits based on alleged securities law violations might have the effect of creating a potential cadre of ready-to-sue clients who could afford to have sufficient stock in any number of companies to be positioned so that counsel could obtain a built-in plaintiff for any contemplated lawsuit. However, the $ 2,000 amount per plaintiff here is not sufficient to trigger such a concern.

857 F. Supp. at 337. Similarly, there is no ethical concern here. The Tennessee Rules of Professional Conduct prohibit lawyers from sharing fees with nonlawyers except, *inter alia*, "a lawyer may share a court-awarded fee with a client represented in the matter for which the fee was awarded." Tenn. Sup. Ct. R. 8, Rule 5.4(a)(4).

The scarcity of incentive awards paid from counsel's fees may be indicative of their problematic nature. Because the incentive award will come directly from attorney's fees, Plaintiffs' counsel is asking for the opportunity to pay the named plaintiffs. This puts Plaintiffs' counsel in an unusual position, seeking to convince a court they should pay money. While the amount of money here ($10,000 total) is small relative to the total attorney's fees, it is still an expenditure, and therefore their own financial interest conflicts with the named plaintiffs. Plaintiffs' counsel has the most information about what involvement the named plaintiffs had; yet their description of the named plaintiffs' activities is skimpy. Furthermore, Defendants have no motivation to challenge Plaintiffs' counsel's assertions. In addition, paying plaintiffs could lead to professional plaintiffs. These considerations suggest that it is generally best for incentive awards to be paid out of a common fund or by defendants, rather than by plaintiffs' counsel.

15

That consideration counsels against an incentive award in this case, as does the lack of risk

and effort involved in being a named plaintiff in this case. In general, incentive awards are

appropriate if compensation would be necessary to induce an individual to become a named plaintiff

in the suit. *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 410 (7th Cir. 2000). District courts

in the Sixth Circuit have considered the following factors in determining the propriety of incentive

awards in class action cases:

> (1) the action taken by the Class Representatives to protect the interest of Class
> Members and others and whether these actions resulted in a substantial benefit to
> Class Members; (2) whether the Class Representatives assumed substantial direct
> and indirect financial risk; and (3) the amount of time and effort spent by the Class
> Representatives pursuing the litigation.

*Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250 (S.D. Ohio

1991). *See also Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) ("In deciding whether such

an award is warranted, relevant factors include the actions the plaintiff has taken to protect the

interests of the class, the degree to which the class has benefitted from those actions, and the amount

of time and effort the plaintiff expended in pursuing the litigation.").

This case is not a class action, of course, and that fact explains in large part why the named

plaintiffs had less involvement and risk. Plaintiffs represent they intervened as named plaintiffs

because the original plaintiffs sold their stock. By intervening, the named plaintiffs allowed the case

to proceed and ultimately benefit Unum. The named plaintiffs reviewed the consolidated complaint

and familiarized themselves with the derivative claims, were available to discuss the status of the

case and the settlement, provided counsel documents and materials in support of their standing as

derivative plaintiffs, and worked with counsel in drafting and executing declarations in support of

their motion to intervene. But while the named plaintiffs were helpful in protecting shareholder

16

rights, they came in to the case mid-stream and did not face the risks associated with being a named plaintiff in a class action, such as having to be investigated and deposed. Although the named plaintiffs had to spend time and energy working on this case, it does not appear they spent an exorbitant amount of time. *See Silverberg v. People's Bank*, 23 F. App'x 46, 48 (2d Cir. 2001) (finding no abuse of discretion in determination that named plaintiff's contributions "did not rise to the level of special circumstances warranting an incentive award"); *Montgomery*, 231 F.3d at 410 (affirming rejecting of incentive award where it did not appear named plaintiff "devote[d] an inordinate amount of time to the case"); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 914 (S.D. Ohio 2001) (approving $50,000 award for named plaintiff who was instrumental in litigation, performed numerous tasks, and worked 800 hours on the litigation). Furthermore, there is no indication the named plaintiffs had direct or indirect financial risk.

Another problem with an award is that the shareholders receive no direct benefit while an incentive award will give the named plaintiffs a different recovery and thus affect their decision on the merits of a settlement. Just like with class actions, Fed. R. Civ. P. 23(a)(4), derivative actions require the plaintiff to fairly and adequately represent the interests of shareholders, Fed. R. Civ. P. 23.1(a). For instance, in *Franks v. Kroger Co.*, the Sixth Circuit originally rejected a class settlement which appeared to give two named plaintiffs incentive awards while other class members received no benefit. 649 F.2d 1216, 1225 (6th Cir. 1981). Subsequently, the panel reheard the case and approved the settlement after concluding it did benefit the class members. 670 F.2d 71, 72 (6th Cir. 1982). Although the settlement has already been approved, the possibility of incentive awards could put named plaintiffs in a different position than the rest of the shareholders and could interfere with their ability to judge the settlement's fairness.

17

Having evaluated these considerations, the Court concludes an incentive award is not

appropriate under the circumstances of this case.

## IV.     CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** Plaintiffs' motion for attorney's

fees and award $3.3 million, and the Court will **DENY** the motion for an incentive award for the

named Plaintiffs.

An Order shall enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

18